UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JEFFREY ZHU,                          :
                                      :    Civil Action No. 10-4447 (DMC)
                Petitioner,           :
                                      :
        v.                            :    OPINION
                                      :
GREG BARTKOWSKI, et al.,              :
                                      :
                Respondents.          :

**APPEARANCES:**

    JEFFREY ZHU, Pro Se Petitioner
    # 276666/898773B
    New Jersey State Prison
    P.O. Box 861
    Trenton, New Jersey 08625

    VEROD ADONI, ESQ.
    BERGEN COUNTY PROSECUTOR'S OFFICE
    10 Main Street
    Hackensack, New Jersey 07601

**CAVANAUGH**, District Judge

Petitioner Jeffrey Zhu ("Petitioner"), a convicted state prisoner presently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his New Jersey state court judgment of conviction entered on or about February 16, 1995. For the reasons stated herein, the Petition will be denied for lack of substantive merit.

## I.   BACKGROUND

### A.   Procedural History

On June 1, 1994, a Bergen County Grand Jury indicted Petitioner and six co-defendants, Xin Dan Lin, Yun Lin, Chao Lin Feng, Cho Lee Lin, Simon Lau and Sing Jun Jang, on numerous charges as follows: (Counts 1 through 5) capital murder; (Counts 6, 7, 8, and 9) murder of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 10, 11, 12, and 13) felony murder-kidnapping of Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 14, 15, 16 and 17) felony murder-burglary Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Counts 18, 19, 20 and 21) felony murder-arson Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo, respectively; (Count 22) attempted murder of Chang Liang Lin; (Count 23) attempted murder of Ah Mee Lui a/k/a Ming Cheng; (Count 24) kidnapping of Liang Qun Guo; (Count 25) kidnapping of Chang Liang Lin; (Count 26) burglary; (Count 27) attempted arson; (Counts 28 through 34) possession of various weapons for an unlawful purpose, including a .25 automatic, a .380 automatic, a "Mac 11," a .38 Smith and Wesson, a ".357 Mag," a "9 mm Lug," and knives and a saw; (Count 35) unlawful possession of a weapon, namely a "9 mm Mac 11;" (Count 36) possession of a defaced firearm - 25 Auto; (Count 37) possession of a defaced firearm - 9 mm Mac 11; and (Count 38)

possession of hollow point bullets.  (Petitioner's Brief at pp.
1-2; Indictment).

A trial was held before the Honorable William C. Meehan,
J.S.C. and a jury on September 11, 1995.  Trial concluded on
December 15, 1995, when the jury convicted Petitioner on (Counts
6 through 9) murder of Ling Wang Guo, Yu Ping Zhang, Guang Sheng
Li and Liang Qun Guo, respectively; (Counts 13 through 17) felony
murder-kidnapping of Liang Qun Guo and felony murder-burglary of
Ling Wang Guo, Yu Ping Zhang, Guang Sheng Li and Liang Qun Guo,
respectively; (Counts 22 and 23) attempted murder of Chang Liang
Lin and Ah Mee Lui a/k/a Ming Cheng; (Counts 24 and 25)
kidnapping of Liang Qun Guo and Chang Liang Lin; (Count 26)
burglary; (Count 27) attempted arson; (Counts 28-33) 2nd degree
possession of weapons, various firearms, for an unlawful purpose;
(Count 34) 3rd degree possession of weapons, namely, knives and a
saw, for an unlawful purpose; (Count 35) unlawful possession of a
weapon - 9 mm Mac 11; (Count 37) possession of a defaced firearm
- 9 mm Mac 11; and (Count 38) possession of hollow point bullets.
Counts 1 through 5 charging capital murder were dismissed.
Petitioner was acquitted of the remaining charges, Counts 10-12,
18-21, and 36.  (Petitioner's Brief at pp. 2-3; Judgment of
Conviction).

On February 16, 1996, Judge Meehan sentenced Petitioner to
an aggregated sentence of four consecutive terms of life

imprisonment with 120 years of parole ineligibility.  (Judgment of Conviction, Petitioner's Appendix at 3).

On March 22, 1996, Petitioner filed a Notice of Appeal with the Superior Court of New Jersey, Appellate Division.  (Pet. App. at 4).  On April 5, 1999, the Appellate Division affirmed the conviction and aggregate sentence, but remanded the matter for appropriate mergers.  (Respondents' Exhibit 5 - April 5, 1999 Appellate Division Opinion).

On February 29, 2000, the Supreme Court of New Jersey granted certification limited solely to the issues arising out of courtroom security measures used during Petitioner's trial. State v. Zhu, 163 N.J. 78 (2000).  On October 23, 2000, the Supreme Court of New Jersey affirmed the Appellate Division's decision.  State v. Zhu, 165 N.J. 544 (2000).

Petitioner promptly filed a petition for postconviction relief ("PCR") in state court, which was denied without an evidentiary hearing by Judge Meehan on December 9, 2005.[1]  (Pet. App. at 8).  Petitioner field an appeal with the Appellate Division.  On April 6, 2010, the Appellate Division affirmed the trial court's denial of the PCR petition.  State v. Cho Lee Lin, et al., 2010 WL 1330272 (N.J. Super. A.D., April 6, 2010).  The

---

[1]  Oral argument on the PCR petition was conducted on November 21, 2005.  See Petitioner's Reply at Exhibit C, November 21, 2005 PCR Transcript ("PCRT").

Supreme Court denied the petition for certification on June 30, 2010.  State v. Zhu, 203 N.J. 92 (2010).

Petitioner timely filed this habeas petition, pursuant to 28 U.S.C. § 2254, on or about August 30, 2010.  The State responded to the petition, and provided the relevant state court record, on June 14, 2011.  Petitioner filed a reply/traverse on or about July 8, 2011.

B.  Factual Background

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the recitation as set forth in the published opinion of the Supreme Court of New Jersey, decided on October 23, 2000, with respect to Petitioner's direct appeal:

> Defendants are members of a Chinese gang known as Fuk Ching.
> The gang's activities included extortion, arson, and loan
> sharking.  At the time of the murders the gang derived
> profits from smuggling illegal Chinese aliens into the
> United States.  The immigrants purportedly paid between
> $20,000 and $30,000 for transportation and were required to
> pay back approximately $1,000 a month to the gang.  Many, if
> not most, of the immigrants took low-paying jobs and were
> forced to live as cheaply as possible, often in gang-run
> "safe houses."  If the immigrants did not repay the debt,
> they were held captive and sometimes beaten.  Some aliens
> became involved in the gang's criminal activities.
>
> In furtherance of the gang's operations, a ship carrying
> hundreds of illegal Chinese immigrants was due to arrive off
> the coast of Massachusetts in 1993.  Rival members within
> the Fuk Ching gang decided that they would kill the gang's
> leader and other high-ranking members and thereby take
> control of those expected immigrants.  On May 24, 1993, the
> rivals attempted to carry out their plan by attacking a safe

house in Teaneck, New Jersey.  There were four gang members and one smuggled alien living in the house, and defendants shot or stabbed all of the occupants (one occupant was actually shot outdoors as he attempted to escape harm). Four of the victims of the attack died; one victim, the alien, survived.

Having received descriptions of the getaway van seen by witnesses, the police arrested all defendants (except defendant Lau) a short time after the shooting at a roadblock near the George Washington Bridge.  The police retrieved numerous weapons from defendants and the safe house, including guns, knives, handcuffs, a container of gasoline, and ammunition.  The police also found blood-stained clothing in the van.  Defendant Lau, who had fled the murder scene in a separate vehicle, was arrested sometime later in Florida and extradited to New Jersey. Defendants were indicted on numerous counts of murder, attempted murder, felony murder, kidnapping, burglary, attempted arson, and various weapons offenses.

(State v. Zhu, 165 N.J. 544, 547-48 (2000)).

This Court also relies upon the recitation of facts as set forth in the unpublished opinion of the Superior Court of New Jersey, Appellate Division, decided on April 6, 2010, with respect to Petitioner's appeal from denial of his state PCR petition:

These were the salient proofs at trial.  Defendants were members of Fuk Ching, a Chinese gang operating in the New York area.  Among other activities, the gang smuggled people from China into the United States.  The Fuk Ching would hold the smuggled aliens in a "safe house" until a sum of money between $20,000 and $30,000 had been paid.

At some point, there was a falling out between Fuk Ching's leader, Ah Kay, and another gang member, co-defendant Xin Dan Lin.  As a result, Ah Kay ordered the killing of Xin Dan Lin.  Two gang members were killed in New York, but Xin Dan Lin managed to escape when the gun held to his head jammed. Ah Kay decided to hide out.  He left his brother Ah Wong in charge of the gang and a safe house on Somerset Road in Teaneck.  Ah Wong lived in the house and was responsible for

handling all arrangements there.  At the time of the murders, there were four gang members living in the house along with one of the smuggled aliens.  It was Ah Wong and these four gang members who became defendants' victims on the evening of May 24, 1993.  The alien, Lin Ling Chang, was the only survivor.  He identified defendants Xin Dan Lin, Yun Lin, Chao Lin Feng, and Cho Lee Lin as among those who committed the murders and who attempted to murder him.

According to Lin Ling Chang, earlier in the day, three of the four resident gang members had left the house, leaving one gang member, Liang Qun Guo (also a brother of Ah Kay), with Lin Ling Chang.  While Lin Ling Chang was in the kitchen, he heard the doorbell ring.  Liang Qun Guo went to the door and moments later a number of people entered the kitchen.  One of the defendants pointed a gun at Lin Ling Chang's head.  Liang Qun Guo started to fight with the intruders.  Gunshots were fired.  Both Lin Ling Chang and Liang Qun Guo were shot.  They were dragged to the basement, tied, and duct taped.

On the evening of May 24, 1993, Ming Cheng, a member of Fuk Ching and Ah Wong's bodyguard, drove from New York to Teaneck with Ah Wong and two other gang members, Yu Ping Zhang and Guang Sheng Li.  Upon their arrival, they found the house locked, and no one answered the doorbell.  Yu Ping Zhang and Guang Sheng Li gained entrance to the house through a window in the back.  Ming Cheng went to the front door.  He was not aware of how Guang Sheng Li got inside the house.

After Ming Cheng and Ah Wong had returned to the front door, the door opened and Ming Cheng heard a gunshot.  He pushed the door open and saw Xin Dan Lin with a gun and several other persons on the stairs inside.  He warned Ah Wong and they both ran, but in opposite directions.  Ming Cheng ran two or three blocks and hid in some bushes.  He saw Ah Wong lying on the ground with three people standing over him and then heard some gunshots.

Alan Tam, one of the main witnesses against defendants, was a member of the Fuk Ching.  He pled guilty in federal court to charges related to the killings and agreed to testify at this trial.  Alan Tam testified that in early April 1993, he spent several days at an apartment in Brooklyn where Simon Lau, Chao Lin Feng, and Jeffrey Zhu attempted to recruit him to participate in the murder of Ah Wong.  The motivation behind this plot was to gain control of the alien smuggling

business and to strike back for the attempted killing of Xin
Dan Lin.  Alan Tam met with Ah Wong four days before the
killing.  He did not warn Ah Wong of the murder plot against
him.
Tu Wei Chung was also a member of the Fuk Ching gang.  Like
Tam, he testified for the State pursuant to a plea agreement
on federal charges.  He corroborated Tam's testimony.

Rhonda Spencer lived in the neighborhood.  She testified
that shortly after 7:00 p.m., while sitting in front of her
residence, she heard something that sounded like glass
breaking. She also heard about four gun shots and ran down
to find her younger brother who was playing on a nearby
street.  She saw a group of men running across a lawn.
While this group of men was running, she saw another man,
with a black stadium jacket, get into a blue van.  The van
then picked up the men who were running.

Teaneck Police Detective Kenneth Croonquist was the first
police officer to arrive at the scene.  Upon arrival, he
approached the front door, peered in, and saw an Asian male
apparently dead.  A small weapon was partially under the
victim's legs.  Sergeant Croonquist saw knives and handguns
scattered about the house.  A second victim was found in the
hallway, lying on his side with no pulse.  Two more victims
were found on the floor of the basement.  Each of these
victims were handcuffed and had duct tape over their mouths.
One of them, Lin Ling Chang, survived.  Among the assassins,
Ah Wong, Guang Sheng Li, Yu Ping Zhang and Liang Qun Guo
died.  Ming Cheng escaped.

Teaneck Police Officer Frank Cox was on patrol in a marked
police car with Officer Kenneth Porrino.  Upon hearing a
police broadcast of a multiple shooting in Teaneck, they
drove to the toll plaza at the George Washington Bridge.  At
7:33 p.m., they saw a blue van with Asian males, which fit
the description provided in the SPEN emergency broadcast,
approaching the toll plaza.  They pulled up close behind the
van, turning on the overhead lights and siren.  Officer
Kevin Mahon used his public announcement system to instruct
the driver to throw the keys out of the window and to come
out of the van.  The driver was defendant Jeffrey Zhu.

(State v. Cho Lee Lin, et al., 2010 WL 1330272, *1-2 (N.J. Super.

A.D., April 6, 2010)).

Finally, in a consolidated opinion of the six direct appeals filed by the various co-defendants in this matter, including Petitioner's direct appeal, the Appellate Division summarized the pertinent facts and evidence as follows:

> There were numerous guns, knives and bullets, among other items, found by the police throughout the house. It was determined that the guns in the house were the weapons used to shoot the victims found in the house.
>
> A number of residents in the area heard the gun shots and saw much of the killing of Ah Wong, as well as the defendants' get-away. As a result of their eye-witness accounts, the two get-away cars were identified and, ultimately, found, as was the nine-millimeter weapon that was used to shoot Al Wong and then thrown under a parked car.
>
> Shortly after the shootings and stabbings, one of the get-away vehicles, a blue van, was spotted by the police as it approached a toll plaza near the George Washington bridge. The vehicle was stopped and the five occupants, defendants Jeffrey Zhu, Xin Dan Lin, Yun Lin, Chao Lin Feng and Cho Lee Lin, were arrested and searched. A knife sheath was found on Zhu. A bullet that matched bullets in an assault weapon found in the front foyer of the house was retrieved from one of Xin Dan Lin's pockets. Numerous inculpatory items were seized from the defendants and the vehicle, including blood-stained clothing.
>
> Blood stain analysis performed on the clothing revealed human blood found on Xin Dan Lin's blue jeans and shoes, on Chao Lin Feng's gold jacket, tee-shirt, black jeans and both sneakers, on Cho Lee Lin's tan jacket, and on the jacket found in the van. DNA analysis revealed that the blood from Cho Lee Lin's tan jacket matched that of Liang Qun Guo (the victim found murdered in the basement), that the blood found on Chao Lin Feng's tee-shirt matched that of Yu Ping Zhang (one of the victims found murdered in the hallway), and that the blood found on Xin Dan Lin's blue jeans also matched that of Yu Ping Zhang. In addition, DNA analysis of blood found on a jacket in the van matched the blood of victim Yu Ping Zhang.

None of the physical evidence at the scene linked Simon Lau
to the crimes.  However, when the second vehicle was later
found abandoned on the lower east side of Manhattan, it was
discovered that it was registered to Simon Lau's sister.
Moreover, Ming Cheng identified him as a participant at the
scene and gang members Allan Tam and Henry Tu provided
testimony that he was actively involved in the planning of
the killings.
Finally, a search of Chao Lin Feng's apartment at 5413 5th
Ave., Brooklyn, revealed a sketch of the layout at 1326
Somerset, which had Tam's fingerprints on it; green knife
sheaths; duct tape; a match book with the name "Simon" and a
telephone number inscribed on it; a plastic container
similar to the containers found at 1326 Somerset that had
gasoline in them; and fingerprints of both Chao Lin Feng and
Xin Dan Lin.

(Resp. Ex. 5, April 5, 1999 Appellate Division Opinion, <u>State v.</u>

<u>Zhu</u>, Docket No. A-4025-95T4 slip op. at 9-10 (N.J.Super.Ct.,

App.Div., Apr. 5, 1999).

## II.   <u>STATEMENT OF CLAIMS</u>

Petitioner asserts the following claims in his petition for

habeas relief:

**POINT I**:  Petitioner's rights to due process and an

impartial jury as guaranteed by the Sixth and Fourteenth

Amendments to the United States Constitution were violated due to

trial court's inadequate voir dire and deprivation of

Petitioner's statutory rights to intelligently challenge jurors

for cause and exercise peremptory challenges.

A.   The jury selection procedures employed by the trial

court resulted in impermissibly cursory jury voir dire.

B.   The jury selection procedures and practices by the trial

court violated Petitioner's constitutional right to a fair and

impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**POINT II:**  The trial court committed reversible error by denying Petitioner's motion to voir dire the jury regarding published prejudicial information, thereby violating Petitioner's right to be tried by a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and that of the New Jersey Constitution, 1947 Art. 1, Par. 10.

**POINT III:**  The testimony of the State's witness which introduced portions of co-defendant Simon Lau's out-of-court statement consisting of prejudicial hearsay violated Petitioner's right of confrontation under the United States Constitution and New Jersey common law, thereby depriving Petitioner of due process of law and a fair trial.

**POINT IV:**  The trial court's failure to dismiss the burglary count of the indictment violated Petitioner's right to due process under the United States Constitution and the New Jersey Constitution.

**POINT V:**  The State's suppression of favorable evidence to Petitioner and knowing use of perjured testimony is a violation of the rules of discovery and prosecutorial misconduct, thereby violating Petitioner's right to a fair trial and due process

rights secured by the United States Constitution and the New Jersey Constitution.

A. The State's suppression of police report evidence which was favorable and exculpatory was a violation of the rules of discovery, prosecutorial misconduct and a denial of Petitioner's right to a fair trial.

B.  The State knowingly used perjured testimony.

**POINT VI**:  Petitioner was deprived of effective assistance of trial counsel when counsel failed to exercise Petitioner's six remaining peremptory challenges to strike certain jurors, which resulted in a biased jury thereby depriving Petitioner of his right to effective assistance of counsel, due process of law, and a fair and impartial jury, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, and the New Jersey Constitution (1947) Art. I, Pars. 1, 9, 10.

**POINT VII**: "The trial court's accomplice liability instruction failed to convey to the jury that in any or all of the offenses charged, the accomplice could be found guilty to a lesser degree than the principal, based on the accomplice's own mental state eroded the prosecution's burden to prove guilt beyond a reasonable doubt, rendered Petitioner's trial fundamentally unfair in violation of his right to a fair trial and due process under the United States Constitution Amendments Sixth and Fourteenth."

**POINT VIII**: The Petitioner was denied his right to the effective assistance of counsel guaranteed by the Sixth Amendment of the U.S. Constitution.

**POINT IX**: Cumulative Error.

The State essentially contends that Points I, IV and V are procedurally defaulted, that Points II, III, VI and VII lack merit, and that Point VIII fails to raise a federal constitutional issue. To the extent that Petitioner's claims are procedurally defaulted, this Court will deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). See Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005) ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit. Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

### III.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be

construed liberally and with a measure of tolerance.  See <u>Royce</u>
<u>v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney</u>
<u>General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v.</u>
<u>Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399
U.S. 912 (1970).  Thus, because Davenport is proceeding as a <u>pro</u>
<u>se</u> litigant in this matter, the Court will accord his habeas
petition the liberal construction intended for <u>pro</u> <u>se</u>
petitioners.

Section 2254(a) of Title 28 of the United States Code gives
the court jurisdiction to entertain a habeas petition challenging
a state conviction or sentence only where the inmate's custody
violates federal law.  28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to
deciding whether a conviction violated the Constitution, laws, or
treaties of the United States." <u>Estelle v. McGuire</u>, 502 U.S. 62,
67-68 (1991); 28 U.S.C. § 2254(a); <u>accord</u> <u>Barry v. Bergen County</u>
<u>Probation Dep't</u>, 128 F.3d 152, 159 (3d Cir. 1997).  "Federal
courts hold no supervisory authority over state judicial
proceedings and may intervene only to correct wrongs of
constitutional dimension." <u>Smith v. Phillips</u>, 455 U.S. 209, 221
(1982).  Generally, "[i]f a state prisoner alleges no deprivation
of a federal right, § 2254 is simply inapplicable," <u>Engle v.</u>
<u>Isaac</u>, 456 U.S. 107, 120 n. 19 (1982), and "a state court's
interpretation of state law, including one announced on direct

14

appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

In reviewing a § 2254 petition, a federal court is not permitted to address a federal constitutional claim pertinent to the facts of the case unless the petitioner asserts the claim as a ground for relief. That is, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). In addition, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997)(citations and internal quotation marks omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

In addition to the case law, the Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court. See 28 U.S.C. § 2254(d).

15

The unreasonableness standards of § 2254(d) govern only claims that were "adjudicated on the merits in State Court proceedings." 28 U.S.C. § 2254(d). "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004)(citations and internal quotation marks omitted), reversed on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005); see also Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006). A state court may render an adjudication on the merits of a federal claim by rejecting the claim without any discussion whatsoever. See Rompilla, 355 F.3d at 247. See also Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538 U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)(even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference)). On the other hand, "[i]f the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply." Rolan, 445 F.3d at 678. See also Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000)(with respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment), cert.

16

denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).

If the New Jersey courts adjudicated the petitioner's claims on the merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied. See 28 U.S.C. § 2254(d). Accordingly, this Court may not grant habeas relief to the petitioner unless the adjudication of a federal claim by the New Jersey courts involved an unreasonable application of clearly established Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Adamson is in custody in violation of the Constitution or laws or treaties of the United States. See 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), the court must begin its analysis by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

17

A decision is "contrary to" a Supreme Court holding within 28 U .S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." <u>Williams</u>, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id</u>. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.[2]  <u>See id</u>. at 409-10. "The unreasonable application test is an objective one–a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." <u>Thomas v. Varner</u>, 428 F.3d 491, 497 (3d Cir. 2005) (quoting <u>Jacobs v. Horn</u>, 395 F.3d 92, 100 (3d Cir. 2005)).

---

[2]  <u>See also</u> <u>Marshall v. Hendricks</u>, 307 F.3d 36, 71 n. 24 (3d Cir. 2002)("[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent.")(citations and internal quotation marks omitted).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." <u>Id</u>.; <u>see</u> <u>also</u> 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  <u>See</u> <u>Duncan</u>, 256 F.3d at 196 (<i>citing</i> 28 U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." <u>Mastracchio v. Vose</u>, 274 F.3d 590, 597-98 (1st Cir. 2001).

## IV.   <u>ANALYSIS</u>

A.   <u>Jury Selection Procedures Claim (Point I)</u>

In his first claim for relief, Petitioner asserts that the jury selection procedures at his trial violated his constitutional rights to due process and a fair and impartial jury as guaranteed under the Sixth and Fourteenth Amendments.  In particular, Petitioner claims that the trial court conducted a cursory jury voir dire that infringed his ability to intelligently challenge jurors for cause and exercise his peremptory challenges.

Prior to jury selection, the trial court decided, with the agreement of all parties, that an extensive juror questionnaire should be prepared so as to address numerous concerns regarding the trial.  These concerns involved the security measures to be

taken by the Sheriff's Department at trial; media and news reports that had covered aspects of the Petitioner's case involving Chinese gangs and the smuggling of illegal aliens; the fact that Petitioner, his co-defendants and most of the victims were illegal aliens; and a substantial likelihood that racial issues would be inextricably bound with issues to be decided at trial and bias on the part of potential jurors. Accordingly, on May 30, 1995, the trial court ordered that defense counsel submit a draft of proposed voir dire questions and designate two attorneys to conduct individual voir dire questioning should such individual voir dire questioning be required. Each potential juror was to complete the questionnaire before their in-court voir dire, which, among other things, would indicate his/her occupation, familiarity with the case, attitude towards illegal immigrants and gangs and defendants' race. The completed questionnaires were to be photocopied by the prosecutor's office and each defendant's counsel would be given a copy to review before voir dire. (Pet. Brief at pp. 23-24).

At the beginning of jury selection, the trial court voir dired prospective jurors based on their answers to the questionnaires. Defense counsel was then allowed to ask follow-up questions based on the answers to the questionnaires. This became a time-consuming process such that after two whole days of jury selection, only six jurors were qualified. Consequently,

20

the prosecutor complained and the trial court "dramatically reduced" the number of questions posed to prospective jurors. In addition, as Petitioner argues:

> The questions asked were leading in nature - making the correct answer unmistakably clear to the jurors, by placing the weight of the court's authority behind a suggested answer. Moreover, when a biased answer was offered by a juror, the court would abruptly intercede with close-ended, heavy-handed and highly leading questions; not probing for the source of possible bias, but aimed to qualify a juror via programmed "yes" or "no" response.

(Pet. Brief at pp. 24-25).

Defense counsel objected to this process, but the trial court ignored the complaints, noting that defense counsel had drafted the questionnaires.

Petitioner further asserts that, because the prosecutor complained about photocopying the questionnaires, the trial court ruled that no standard voir dire questions would be asked, that the court would only rely on the completed questionnaires to conduct voir dire, and that the defense would not be given a copy of the questionnaire. Petitioner concedes that the court did agree to defense counsels' suggestion that, under these circumstances, all questions contained in the questionnaire would be asked verbally so counsel could hear the answers. (Pet. Brief at pg. 27).

However, as Petitioner relates, when voir dire resumed, the trial court failed to ask all the questions, and in fact, fifty (50) out of the sixty-six (66) qualified jurors were asked only

21

two or three pointed questions.  Petitioner further asserts that the trial court spent less than one minute on each voir dire when selecting five of the sitting jurors.  Defense counsel again objected, but their objection was ignored.  (Pet. Brief at pp. 27-28).

Despite this abbreviated voir dire, after seven full days of jury selection, only 46 jurors were qualified from a pool of 500 prospective jurors.  Consequently, the court further expedited the selection process by delegating to the jury commissioner the authority of pre-qualifying potential jurors.  The court also unilaterally reviewed the questionnaires for anything of concern then let defense counsel review them.  Thus, Petitioner contends that defense counsel were "forced to review the questionnaire via circulation while the court [was] conducting the in-court voir dire of the jurors ... in direct violation of [P]etitioner's right to be present at a critical stage of his trial."  (Pet. Brief at pg. 29).  In other words, Petitioner argues, this "ex parte" process by the trial court removed defense counsel's ability to review the questionnaires before voir dire and subverted counsels' ability to ask follow-up questions to determine if the court's follow-up questions.

Petitioner further argues that this truncated process "severely hampered [his] ability to participate in jury selection, resulting in the denial of [his] right to a fair and

impartial jury.  It only served to take away petitioner's ability to participate in juror voir dire, detect bias and intelligently exercise his peremptory challenges.  The effectiveness of the questionnaires is amply demonstrated by the record, in that, when proper follow-up questions were asked by counsel based on a suspect answer, juror bias was uncovered."  (Pet. Brief at pp. 30-31).

In particular, Petitioner points to the selection of three jurors, who ultimately sat on the jury, which demonstrated bias violated Petitioner's right to a fair and impartial jury.  First, Juror D.R. indicated on the questionnaire that she could not decide each defendant's guilt or innocence separately, but the trial judge did not ask a follow-up question on voir dire.  D.R. also answered that she read the <u>Bergen Record</u> every day and had heard or read about this case prior to trial.  The court never asked D.R. about any bias or prejudice she may have had based on this prior knowledge.  Finally, D.R. answered that she did not know if she would give law enforcement testimony greater, lesser or equal weight as other testimony.  On voir dire, the trial court allegedly forced the juror to respond, "I think so."  (Pet. Brief at pp. 36-37).

Next, as to Juror E.O., the juror responded "Yes" to Question 31 of the questionnaire, which asked whether the immigration status of the defendants would affect her ability to

deliberate fairly and decide the case solely on the facts.   Juror

E.O. repeated this response when the judge questioned her on voir

dire several times.   The judge continued to ask the same question

until E.O. changed her answer.   Defense counsel objected to the

court's manipulation of the juror, and challenged the juror for

cause.   Nevertheless, the court denied their motion.   Finally,

E.O. indicated she had a son-in-law who was a police officer, but

responded to the voir dire by the court that she would evaluate

the credibility and testimony of a police officer the same as

anyone else.   Juror E.O. was selected for the jury.   (Pet. Brief

at pp. 37-39).

Finally, as to the third juror, Juror A.R., it was revealed

on voir dire that she had a brother who was murdered in August

1994 and that the suspect was an illegal alien.   In response to

the court's questions, A.R. answered that this fact would not

affect her ability to be fair because she did not plan to get

involved in her brother's case.   Co-counsel requested that A.R.

be dismissed from the jury for cause, but the court inexplicably

denied the motion.   (Pet. Brief at pp. 39-42).

Petitioner raised this claim in his state PCR petition.   In

ruling on the issue, the PCR court held as follows:

> [Defendants raise] certain requests concerning jury
> selection.   In that regard, there is the jury questionnaire,
> a very extensive one prepared, and it was prepared through
> the cooperation of defense counsel, with the prosecutor
> participating, and with the Court to some extent.   Twelve
> pages with an attached list of witnesses and so forth.   And

24

I know Mr. Zhu obtained an affidavit of Mr. Pieroni which
raises, I think, questions of what he says is not quite
accurate.  He says there was only one for all six defense
attorneys, and I know that's not accurate, because Mr.
Murray was providing the first until whatever reason he
became upset with some argument of counsel, and I don't
remember what it was now, he wasn't going to do it. But
thereafter, they were provided, sometimes a little slower
than liked.

But Mr. Pieroni says there was only one copy, but he ends up
with 800 pages of jury questionnaire[s], and that would mean
that no one else had them but him, and that's not so.
Knowing Mr. McAlevy and Mr. Neary, they would not end up
without their file, and I don't mean to say that Mr.
Weichsel, Contaldi or Jerejian wouldn't.  It is clear they
were being submitted, because Mr. Pieroni says there were
fifteen pages.... [T]he panel selection was not—we didn't
fill a seat up at one time, we waited until we had a certain
number and then proceeded to pick the jury.  Then the
appellate court would have to understand this is not a
normal se[le]ction where a panel comes in, put fourteen in
the box, and find out if they could serve or not serve.
This was done by first finding out if they could spend the
time, and then they filled out the questionnaire.  Of the
200 jurors who showed up, according to Mr. Pieroni, I would
assume that at least half walked out on a fifty-two day
trial with job, plans, employment.

In fact, I personally think the 200 who were never actually
screened, it is more than 200, and, of course, while he
complains, Mr. Pieroni, he says fifty pages of
questionnaire. It's not like reading a book.  We all know
certain questions are very important, some are not.  You
want to know where they work, where they live.  Then you
want such items like what newspaper they read, what high
school they went to, and the issue concerning law
enforcement officers is covered in the questions.

As I said, prepared by the defendants, gone over by the
Court, and now after the trial is over we're being told that
three jurors should not be allowed to sit on the case.  The
defendants had not run out of challenges.  As I said, you
deal with between McAlevy, Weichsel, Jerejian, Neary, and-I
shouldn't say McAlevy here, but McAlevy is a well known
criminal defense attorney who is constantly trying murder
cases all over New Jersey.  Neary is trying them in Bergen
County, at least two a year, if not more.  Jerejian tries

them.   John Weichsel tries them.   Contaldi has been involved
with them.   Pieroni, who is a regular appearing in criminal
trials in this courthouse, and they're all very active
defense attorneys.

As I said, some of the premier ones, that there is a juror
that shouldn't be there, is total nonsense, and that jurors
were rehabilitated is-sometimes there are jurors you like,
because they're making a promise to you that they will be
fair and impartial.   They didn't check it off as a routine
because they wanted to get on jury duty.   They're making the
promise, and as I say, the trial lawyers relied upon that
promise, more so than others.

There may be certain things that you like about that person,
which doesn't show here.   The appearance to understand a
respective juror.   How they talk.   You know, their voice
means a lot.   People, when evaluating jurors, how they walk,
do they slouch, do they stand up straight, do they stand up
tall.   Are they leaders, because that's one of the questions
that was asked.   Do they supervise people.

The purpose of that is to find out people in charge of
people.   Do they take care of people, leave and promoted.
I'd find beyond belief that six very active defense
attorneys would allow someone like Miss Rakowski there, that
they didn't think—or O'Brien, Reavis.   As I said, with
regard to that one, the last death penalty case I tried, one
of the jurors who stayed on had a father killed in a
burglary—it really was not quite a burglary but taking a
cash box by someone who even worked at the Sears, or leaving
to go to another building on their property, and that was
the one juror who voted for life over death.

So there are reasons for leaving them on when you're a
defendant.   Again, you evaluate the entire person, not part
of the answer.   I don't find that defendants-and it's my
recollection, not that you can check it out, but I believe
all defendants had a few challenges left-maybe not Mr.
Pieroni, but most of the other defendants had challenges
left.   So, it wasn't a question that this was forced down
their throat.

(November 21, 2005 PCRT 91:15-95:15, attached as Exhibit "C" to

Petitioner's Reply at Docket entry no. 12-2).

The State responds to this claim, asserting that it is

procedurally defaulted because the Appellate Division rejected

26

the claim on the basis of a state procedural bar, namely, N.J.Ct.R. 3:22-4 (Bar on Grounds Not Raised in Prior Proceedings). It is clear, however, that the PCR court addressed the merits of this claim and rejected it on those grounds as well. In any event, as stated above, to the extent that Petitioner's claims are procedurally defaulted, this Court may deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2). See Bronshtein, 404 F.3d at 728 ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit. Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here"). Accordingly, this Court will turn to the merits of this claim.

"Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431 (1991). "No hard-and-fast formula dictates the necessary depth or breadth of voir dire." Skilling v. United States, ___ U.S. ___, 130 S.Ct. 2896, 2917 (June 24, 2010). "The Constitution ... does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 729 (1992).

In the federal prosecution of Jeffrey Skilling, the chief executive officer of Enron, the Supreme Court rejected Skilling's claim that the voir dire was insufficient because jury selection lasted only five hours, most of the court's questions were conclusory and failed to adequately probe jurors true feelings, and the court consistently took prospective jurors at their word once they claimed they could be fair.  See Skilling, 130 S.Ct. at 2918.  In that case, the district court "initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by Skilling.  That survey helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array."  Id. at 2919.  The Supreme Court held that Skilling failed to show that the five-hour voir dire violated Skilling's constitutional right to an impartial jury:

> The District Court, moreover, did not simply take venire members who proclaimed their impartiality at their word ....
> [A]ll of Skilling's jurors had already affirmed on their questionnaires that they would have no trouble basing a verdict only on the evidence at trial.  Nevertheless, the court followed up with each individually to uncover concealed bias.  This face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service . ...  The jury's not-guilty verdict on nine insider-trading counts after nearly five days of deliberation, meanwhile, suggests the court's assessments were accurate.  Skilling, we conclude, failed to show that his voir dire fell short of constitutional requirements.

Skilling, 130 S.Ct. at 2922-2923 (citations and footnotes omitted).

Here, "there were eight days of jury selection," State v. Zhu, 165 N.J. at 551, as opposed to five hours in Skilling.  In Petitioner's case, like Skilling's, the Law Division used a questionnaire prepared by defense and the judge followed up with face-to-face questioning aimed at bias.  Also, the fact that the jury found Petitioner not guilty of counts 10, 11, 12, 18, 19, 20, 21, and 36 suggests that the trial court's and defense counsels' assessments of juror fitness were accurate.  At the very least, fair-minded jurists would disagree whether the voir dire was so inadequate that Petitioner was not able to identify unqualified jurors and, in that case, the standard under § 2254(d)(1) is not satisfied.  See Harrington, 131 S.Ct. at 786; Morgan, 504 U.S. at 729.

Petitioner also singles out three jurors who, he claims, were actually biased.  "In reviewing claims of this type, the deference due to [trial] courts is at its pinnacle: 'A trial court's findings of juror impartiality may be overturned only for manifest error.'" Skilling, 130 S.Ct. at 2923 (quoting Mu'Min, 500 U.S. at 428).  In this case, as in Skilling, no defense counsel regarded these jurors as so biased as to warrant exercise of a peremptory challenge.  Skilling, 130 S.Ct. at 2923 n. 31 ("[U]se [of] a peremptory challenge to effect an instantaneous cure of [a trial judge's erroneous for-cause ruling] exemplifies a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury")

29

(citation and internal quotation marks omitted).  Moreover, here, as in <u>Skilling</u>, the trial judge (and defense counsel) "had looked [each of these jurors] in the eye and ... heard all [their answers and] found [their] assertions of impartiality credible." <u>Id</u>. at 2924 (citations and internal quotation marks omitted). Under these circumstances, the New Jersey courts' adjudication of Petitioner's inadequate voir dire claim was not contrary to, or an unreasonable application of <u>Skilling</u> or other Supreme Court holdings.  Accordingly, this claim will be denied for lack of merit.

B.   <u>Failure to Voir Dire Jury on Prejudicial Publicity</u>

In Ground Two of his habeas petition, Petitioner contends that the trial court committed reversible error by denying defendants' request to voir dire jurors regarding published prejudicial information, namely, a newspaper article appearing in the <u>Bergen Record</u> on December 5, 1995,[3] which had revealed the substance of co-defendants' statements to police during interrogation and was not presented to the jury as evidence during trial, in violation of Petitioner's Sixth and Fourteenth Amendment rights.

These claims were raised by Petitioner and the co-defendants on direct appeal.  In particular, the facts regarding

---

[3]   Petitioner also discusses two other instances of prejudicial articles that had appeared in local newspapers during the trial.  (Pet. Brief at pp. 52-55).

Petitioner's Claim Two were recited by the Appellate Division in

its April 5, 1999 Opinion, as follows:

> Because there had been pretrial publicity of the case, the
> trial judge incorporated in his jury selection questionnaire
> a number of questions that probed the prospective jurors'
> awareness of and/or exposure to such publicity and, if so,
> whether the publicity had led to their having formed an
> opinion about the case.  He also gave publicity-related
> warnings during the selection process and periodically
> throughout the trial.

> During the selection process, an article appeared in the
> local newspaper regarding a hunger strike defendants engaged
> in to protest alleged abuses against them by the Sheriff's
> office. The trial judge refused a request to voir dire the
> prospective jurors about the article but did, as it had
> previously, caution the jurors not to listen to any media
> accounts on TV or radio and not to read any newspaper
> articles regarding the case.  He specifically warned the
> panel about the article in that day's paper and reminded
> them that the case had to be decided based on the evidence
> presented in the courtroom, not on what was printed in a
> newspaper.

> On September 26, 1995, just prior to opening arguments,
> defense counsel brought to the trial judge's attention an
> article in that Sunday's Star Ledger which included photos
> of all the defendants and a headline which read, "Who Pulled
> the Trigger?" The first sentence of the article read, "[i]t
> was one of the bloodiest murders the state has ever seen"
> .... The trial judge refused counsel's request to voir dire
> the jury regarding the article, observing that the Star
> Ledger was not as well read in Bergen County as the Record
> and the Herald News.  But he again cautioned the jury not to
> read any newspaper articles or listen to any TV or radio
> broadcasts about the case.  The jury was also told that
> newspaper and media accounts were not evidence, were often
> based on second- or third-hand information, were not always
> accurate, and were not subject to cross-examination by the
> attorneys....

> The issue of prejudicial publicity did not arise again until
> the middle of the trial.  On October 19, 1995, Zin Dan Lin's
> counsel was arrested for allegedly assaulting a sheriff's
> officer as he was leaving the courtroom.  The incident
> apparently occurred out of the presence of the jury.  But a
> few days later on October 22, 1995, counsel requested a jury
> voir dire, noting that the news regarding the arrest was

"all over the courthouse" and everyone was talking about it.
The trial judge agreed to do so.  Each juror was separately
questioned.

* * *

[The trial judge ultimately] denied defendants' request for
a mistrial but granted the alternative request to dismiss
[one] juror.  During argument on the application, the
prosecutor asserted, "[y]ou're just letting them win.  We
started with fifteen when we should have had sixteen.  We
lost one.  We're going to have one alternative now?"

We cannot be sure, but it may have been this comment which
prompted the trial judge to state the next day, in the face
of yet more publicity, "[t]here are not going to be any more
jury voir dires."  The additional publicity was as follows.
In that morning's Record the prosecutor was quoted as
alleging that defense counsel were maneuvering for a
mistrial because they knew "they don't have a case."  [Two
other articles allegedly quoting the prosecutor were brought
to the judge's attention.]

This prompted the judge to enter a gag order against all
attorneys and all members of the Sheriff's Department.  But
he declined to voir dire the jurors on the three news
articles ...

* * *

In essence, the trial judge, though troubled by the then
flood of publicity, viewed the articles, for the most part,
as extraneous to the case and not containing any evidential
or prejudicial material.  In light of his prior admonitions
to the jury concerning publicity about the case, the judge
found no need to go through another round of voir dires.  We
think his reasoning for not doing so is sound and find no
basis for interfering in the exercise of his discretion.

More troublesome, however, is the judge's handling of an
article that appeared in the Record on December 5, 1995.
When the jury was excused on December 4, 1995, it was not
cautioned about news articles, although it had been so
cautioned periodically throughout the trial.  The article
that appeared the next day in the Record was placed on pages
one and five of the local section and bore the rather
innocuous headline "Defense arguments begin in gang case."
On page one, the article stated that two of the defendants
had not presented a defense but that codefendant Zhu had
called five witnesses in an attempt to show that he was "an

unwitting bystander" who had left Boston in May to see a concert.  The article continued on the fifth page....  It then set forth in one paragraph the prosecutor's theory that the killings resulted from a power struggle within the ranks of the Fuk Ching gang, and followed with information that the defense would wrap up their case quickly....  [T]he article also reported that the trial judge had determined, following a mid-trial voluntariness hearing, that the defendants' statements could be used at trial should they testify because the allegations that the police had beaten and coerced them were false.  Specifically, the article stated:

> None of the remaining three defendants is expected to take the stand in the wake of Judge William C. Meehan's decision that the statements the men gave to police could be used against them.  Last week, defense attorneys had argued that the defendants were beaten and coerced....  But Monday morning, Meehan decided the accusations were false and the statements were admissible.

> According to summaries of those statements, which likely will never be heard by the jury, four of the defendants admitted to being at the scene, but none said he killed anyone.  Dan Xin Lin said he pointed his Uzi at one of the injured victims, but that the gun failed.  Chao Lin Feng said he was offered $100,000 to participate in the revenge killings, while Jeffrey Zhu admitted he drove four of the defendants to Teaneck and had been told to go upstairs in the house to serve as a lookout.

> Meanwhile, one defendant, Cho Lee Lin, said he had been held hostage in the house for a month and, when he heard the shots, crawled out a window and hid in the van.  Another, Yun Lin, said he rode in the van, but that it never stopped and he never saw any weapons or blood.

> The sixth defendant, Simon Lau, who was arrested in Florida this year, never made a statement to police.  A seventh suspect, Shing Chung, remains at large.

The recitation at the end of the article of defendants' police statements casts this article in a different light from all of the others.  Though the statements could have become evidential, albeit with limiting instructions, they did not since defendants chose not to testify.  The December 5, 1995 article, thus, contained evidence that was never

presented to the jury. The potential for prejudicial jury
taint, then, was for more serious than with the prior
articles.... [W]hen the jury was brought into the
courtroom, the judge instructed:

> Before we start, it was brought to my attention
> yesterday I forgot to remind you please do not read any
> articles relating to this case. Articles are not
> always accurate and correct and are not evidence in the
> case. Please don't read any articles or discuss them
> among yourselves or with anyone else.

State v. Zhu, Docket No. A-4025-95T4 slip op. at 15-25.

The Sixth Amendment of the United States Constitution

provides that "the accused shall enjoy the right to ... trial by

an impartial jury." U.S. Const. amend. VI. "The theory of our

[trial] system is that the conclusions to be reached in a case

will be induced only by evidence and argument in open court, and

not by any outside influence, whether of private talk or public

print." Skilling, supra, 130 S.Ct. at 2913. Supreme Court

"decisions, however, cannot be made to stand for the proposition

that juror exposure to ... news accounts of the crime ... alone

presumptively deprives the defendant of due process. Prominence

does not necessarily produce prejudice, and juror impartiality,

we have reiterated, does not require ignorance." Id. at 2914-15

(citation and internal quotation marks omitted)(emphasis in

original). See also Irvin v. Dowd, 366 U.S. 717, 722 (1961)

(Jurors are not required to be "totally ignorant of the facts and

issues involved"; "scarcely any of those best qualified to serve

as jurors will not have formed some impression or opinion as to

the merits of the case"). Moreover, "[t]he jury's ability to

discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial." <u>Skilling</u>, 130 S.Ct. at 2916 (quoting <u>United States v. Arzola-Amaya</u>, 867 F.2d 1504, 1514 (5th Cir. 1989)).

The Supreme Court noted that its "decisions have rightly set a high bar for allegations of juror prejudice due to pretrial publicity. News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." <u>Skilling</u>, 130 S.Ct. at 2925 n.34. "Jurors ... need not enter the box with empty heads in order to determine the facts impartially. 'It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court.'" <u>Skilling</u>, 130 S.Ct. at 2925 (quoting <u>Irvin v. Dowd</u>, 366 U.S. 717, 723 (1961)).

When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." <u>Mu'Min v. Virginia</u>, 500 U.S. 415, 427

(1991).  "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty.  In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service."  Skilling, 130 S.Ct. at 2918.  Lines of inquiry that "might be helpful in assessing whether a juror is impartial" are not hard to conceive.  Mu'Min, 500 U.S. at 425.  "To be constitutionally compelled, however, it is not enough that such questions might be helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."  Id. at 425–426.  Fundamental unfairness arises if voir dire is not "adequate ... to identify unqualified jurors."  Morgan, 504 U.S. at 729.

     In Mu'Min, the Supreme Court held that the Constitution does not require the state trial court to put questions about the content of publicity to potential jurors.  Id. at 425–26.  The Supreme Court concluded:

> The voir dire examination conducted by the trial court in this case was by no means perfunctory.  The court asked the entire venire of jurors four separate questions about the effect on them of pretrial publicity or information about the case obtained by other means.  One juror admitted to having formed a belief as to petitioner's guilt and was

excused for cause.  The trial court then conducted further
voir dire in panels of four, and each time an individual
juror indicated that he had acquired knowledge about the
case from outside sources, he was asked whether he had
formed an opinion; none of the jurors seated indicated that
he had formed an opinion.  One juror who equivocated as to
her impartiality was excused by the trial court on its own
motion.

<u>Mu'Min</u>, 500 U.S. at 431.

In this case, the Appellate Division rejected Petitioner's

publicity claim as follows:

> In <u>State v. Bey</u> ..., 112 N.J. at 74-92, 548 A.2d 846, the
> [New Jersey Supreme] Court emphasized the need for
> determining whether jurors were exposed to prejudicial
> outside influences in the context of trial publicity....  If
> ... the Court determines that there is a realistic
> possibility that information with the capacity to prejudice
> defendant's right to a fair trial may have reached members
> of the jury, it should conduct a voir dire to determine
> whether any exposure has actually occurred ...
>
> * * *
>
> To begin with, we are convinced that it is only defendants'
> police statements that might be prejudicial should the
> jurors have learned of them through the news articles....
> But reference to those statements was at the end of the
> article and located on a continued page.  Moreover, there is
> no indication in the caption of the article that such
> information might be found therein.  In addition, the
> statements were not *per se* inadmissible and would have been
> used by the State to impeach defendants had they
> testified....
>
> Moreover, for most of the defendants, the statements were
> not incompatible with the general thrust of the defense.
> The defense proffered at trial, generally, was that the
> State's evidence was suspect and that, if the jury were to
> conclude that they were at the scene, they were not involved
> in purposeful or knowing murders.  We recognize that the
> reported statements of Chao Lin Feng and Yun Lin might seem
> contradictory to their trial defense in that each seemed to
> argue at trial that they were mistakenly identified as
> perpetrators, either as principle of accomplice, whereas
> their statements placed each at the scene. However, the
> statements, even if learned of by the jurors, pale in

comparison to the overwhelming evidence properly presented to the jury.  We cannot see how knowledge of them could have, therefore, been prejudicial.

In any event, we are satisfied the second step of the Bey analysis was not established.  Unlike the situation presented in Bey where the highly prejudicial information had been the subject of repeated coverage in the press (at least five newspaper articles), the complained-of material here was published only once.  It received no prominence. Indeed, as we have said, the reported statements were located in the middle of the New Jersey section of the paper at the end of an otherwise innocuous article.  None of the objectionable material was even hinted at in the headline. Hence, the extent, notoriety and prominence of the media coverage afforded this material militates against a finding that a repeated publicity-warned juror was exposed to it.

We also take note of the fact that his jury seems to have rather conscientiously weighed and analyzed the evidence. The acquittals of the arson felon-murders, the kidnapping felony-murders of Liang Wang Guo, Yu Ping Zhang, Guang Sheng Li, and the possession of a defaced .25 caliber Raven Arms semi-automatic revolver, reflect that.

* * *

Therefore, while it might have been better had the trial judge acceded to the request to voir dire the jurors, we are convinced the failure to do so was not error requiring a reversal.

State v. Zhu, Docket No. A-4025-95T4 slip op. at 27-33 (citations

and internal quotation marks omitted).

Here, Zhu argues in his Reply that the New Jersey courts'

rejection of his publicity claim was contrary to, or an

unreasonable application of Sheppard v. Maxwell, 384 U.S. 333

(1966).  Sheppard was a § 2254 case brought by Dr. Sam Sheppard

who was indicted for murdering his wife and who faced the death

penalty.  The Supreme Court ruled that the pretrial and trial

publicity deprived Sheppard of a fair trial.  However, Sheppard

is factually distinguishable, in that Sheppard faced the death penalty; the judge merely requested or suggested that the jury refrain from reading, watching or listening to reports about the case; the judge allowed the newspapers to publish the names and addresses of jurors, who were bombarded with press and letters; three months before trial, a public inquest was televised, where Sheppard was examined for five hours without counsel and the inquest "ended in a public brawl," id. at 354; the trial began two weeks before a hotly contested election at which both the Chief Prosecutor and the judge were candidates for judgeships; "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," id. at 355, and a press table was set up inside the bar; "[p]articipants in the trial, including the jury, were forced to run a ga[u]ntlet of reporters and photographers each time they entered or left the courtroom," id.; and

> [m]uch of the material printed or broadcast during the trial was never heard from the witness stand, such as the charges that Sheppard had purposely impeded the murder investigation and must be guilty since he had hired a prominent criminal lawyer; that Sheppard was a perjurer; that he had sexual relations with numerous women; that his slain wife had characterized him as a "Jekyll-Hyde"; that he was "a barefaced liar" because of his testimony as to police treatment; and finally that a woman convict claimed Sheppard to be the father of her illegitimate child.  As the trial progressed, the newspapers summarized and interpreted the evidence, devoting particular attention to the material that incriminated Sheppard, and often drew unwarranted inferences from testimony.  At one point, a front-page picture of Mrs. Sheppard's blood-stained pillow was published after being 'doctored' to show more clearly an alleged imprint of a surgical instrument.

Id. at 356-57.

The facts in this case regarding prejudicial publicity pales in comparison to the media circus that occurred in and outside the courtroom in Sheppard.  Moreover, the daily assault of media and press coverage with highly prejudicial and non-evidentiary, inflammatory information, to the point that even jurors were included in the media scrutiny, is factually distinguishable from this case.  Accordingly, this Court holds that the New Jersey courts' rejection of this prejudicial publicity claim is not contrary to, or an unreasonable application of Skilling, Sheppard, or other Supreme Court holdings, and Petitioner is not entitled to habeas relief on this ground.

C.  Confrontation Clause Claim - Lau's Out-of-Court Statement

In Ground III of his habeas petition, Petitioner argues that the introduction of co-defendant Simon Lau's incriminating statements, who was not testifying at trial, through the in-court testimony of witness Henry Tu, which implicated Petitioner in the commission of the crimes, violated his rights under the Confrontation Clause of the Sixth Amendment.

Petitioner raised this claim on direct appeal, as well as in his state PCR proceedings.  On direct appeal, the Appellate Division noted this claim, as raised by Petitioner, and stated:

> We are satisfied that defendants received as fair a trial as
> they could, under the circumstances.  We are also satisfied
> that the convictions were based upon overwhelming evidence
> of defendants' guilt.  While, therefore, there may have been
> some trial errors, none of them are such as to require
> reversal.  We have carefully examined all of the numerous
> contentions raised by counsel and pro se defendants in light
> of the entire record and applicable law and are convinced
> all but three issues [security, trial publicity and

sentencing issues] require no further opinion.  R. 2:11-3(e)(2).

(State v. Zhu, Docket No. A-4025-95T4 slip op. at 5-6 (N.J.

Super. Ct., App. Div., Apr. 5, 1999).

Petitioner raised this claim again in his state PCR

petition, and the trial court denied it for lack of merit.

(November 21, 2005 PCRT 101:17-19, Pet. Reply at Ex. C, Docket

entry no. 12-2, 12-3).  On appeal from denial of the PCR

petition, the Appellate Division ruled that this issue, among

others, was procedurally barred by N.J.Ct.R. 3:22-4.  State v.

Zhu, 2010 WL 1330272 at *7 (N.J. Super. A.D., April 6, 2010).

The admissibility of evidence is generally a question of

state law which is not cognizable under habeas review.  See

Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001); Hickey

v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978).  However, the Sixth

Amendment's Confrontation Clause confers rights that cannot be

satisfied merely by meeting the requirements of the rules of

evidence.  The Confrontation Clause provides that, "[i]n all

criminal prosecutions, the accused shall enjoy the right ... to

be confronted with the witnesses against him."  This guarantee

applies to both federal and state prosecutions.  Pointer v.

Texas, 380 U.S. 400 (1965).

In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme

Court held that the Sixth Amendment's Confrontation Clause bars

"admission of testimonial statements of a witness who did not

appear at trial unless he was unavailable to testify, and the

defendant has had a prior opportunity for cross-examination."

Id. at 53-54; see also Davis v. Washington, 547 U.S. 813 (2006). The Court defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.  An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Crawford, 541 U.S. at 51 (citations and internal quotation marks omitted).  As the Supreme Court state in Michigan v. Bryant, __ U.S. __, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011):

> Whether formal or informal, out-of-court statement can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial.  When ... the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.  In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant.  Where no such primary purpose exists, the admissibility of a statement is the concern of the state and federal rules of evidence, not the Confrontation Clause."

Id. (footnote omitted).

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that the admission at a joint trial of a non-testifying co-defendant's confession which also names defendant as a participant in the crime violates the Confrontation Clause, even when the court gives a limiting instruction.  But in Richardson v. Marsh, 481 U.S. 200, 208 (1987), the Supreme Court clarified that the co-defendant's confession or statement must

incriminate the defendant on its face to give rise to a <u>Bruton</u> violation.[4]

Errors under the Confrontation Clause are subject to harmless error analysis.  <u>See</u> <u>Adamson v. Cathal</u>, 633 F.3d 248, 259-61 (3d Cir. 2011); <u>see also</u> <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986); <u>United States v. Hinton</u>, 423 F.3d 355, 362-63 (3d Cir. 2005).  Accordingly, this Court must consider whether the limited introduction of Lau's statement via Tu's trial testimony was harmless or whether it resulted in actual prejudice to Petitioner.  <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). "[A]n error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." <u>Fry v. Pliler</u>, 551 U.S. 112, 116 (2007).  "If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand."  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 437-38 (1995)(quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 764-65 (1946)).

Here, this Court finds that the introduction of Lau's statement through Tu's trial testimony was harmless and had no real influence or little if no actual prejudice to Petitioner. First, the trial court limited the use of the statement as against Lau only and gave several instructions to the jury before

---

[4] Specifically, the <u>Richardson</u> Court held that the Confrontation Clause is not offended when the confession is redacted to eliminate any reference to defendant but the defendant is nonetheless linked to the confession by other evidence.

and after Tu's testimony in which he related Lau's statement. As the record shows, the hearsay statement by Lau was elicited on the direct examination of witness Henry Tu, one of the cooperating co-conspirators called by the State. Tu related his telephone conversation with Lau, which had occurred the morning after the crime, as follows:

> He called me the next morning. He told me that everything has been taken care of and he tell me to be careful. Be careful, meaning Ah Kay's people might come and get me. He just told me to be careful and he told me that Jeff [Zhu] and Dan Xin Lin got busted.

(Trial Transcript #45 [45T] 70:16-20).

Petitioner's counsel immediately objected and the trial judge sustained the objection. (45T 70:21-24). Moreover, as noted by Respondents, the trial court also had instructed the jury beforehand that any hearsay statements made by Lau during this telephone conversation were admissible against Lau only, and could not be used against the other defendants. (45T 70:5-9).

The next day, Petitioner's counsel moved for a mistrial based on Lau's hearsay statement that had implicated Petitioner. The trial judge denied the application, stating that he had advised the jurors that the hearsay statements by Lau could only be used against Lau. (46T 14:16-19:5).

Second, reviewing Tu's entire testimony, he related many events leading up to the crime that implicated Petitioner independent of Lau's hearsay statement. In particular, Tu recalled a trip that many of the co-defendants took, including Petitioner, where Petitioner had purchased gasoline, which was

44

intended to be used to burn down the safe house after the intended targets were killed. Tu also recounted another trip where all parties, including Petitioner, brought guns and knives to be used at the safe house, but since someone was looking out the window, nothing was done that day. (45T43:7-46:24; 62:3-65:8). Additionally, Tu testified that he had gone to a flea market with Xin Dan Lin, Chao Lin Feng and Petitioner, where Xin Dan Lin purchased knives and handcuffs. (45T 47:11-51:18). Further, Tu testified about a conversation he had with Petitioner in which Tu expressed his reluctance to participate in the murders. Tu testified that Petitioner indicated the same reluctance but said that he would go through with the plan if the others did so. (47T 67:1-21).

Finally, Tu's testimony was largely corroborated by another co-conspirator's testimony, Tam, so that it is clear that Lau's hearsay statement, which was stricken from the record, had no capacity to affect the verdict against Petitioner. Indeed, there was other overwhelming circumstantial evidence against Petitioner, including: (1) Petitioner was observed running down the streets with the group that had chased down and killed Ah Wong; (2) Petitioner had picked up members from this group after they had fatally wounded Ah Wong, and sped off in the blue van; (3) Petitioner was in the blue van, which had been stopped by police within 20 minutes, and which had contained a set of handcuffs, duct tape, radios, and several occupants who had the blood of the victims on them; and (4) Petitioner was observed

wearing a glove that evening and had an empty knife sheath on his belt.

Therefore, based on the overwhelming evidence against Petitioner, and the trial court's limiting instruction to the jury cautioning the jurors that the statement could only be used against Lau and not the other co-defendants, this Court concludes that any error in admitting the statement was harmless, and had little to no injurious or harmful effect in determining the jury's verdict. Petitioner is not entitled to habeas relief on the Confrontation Clause claim asserted in Ground Three of his petition.

D. <u>Failure to Dismiss Burglary Count Violated Due Process</u>

Next, in Ground Four of his petition, Petitioner argues that the "failure to dismiss the burglary count of the indictment violated petitioner's right to due process." (Petitioner's Brief at Point IV, pp. 76-79). As factual support for this claim, Petitioner essentially argues that the trial judge's failure to dismiss the burglary count before submitting it to the jury was improper because the state presented no evidence showing that Petitioner was in the house or that he shared the same purpose with regard to anyone in the house. This Court construes this ground as a sufficiency of the evidence claim.

A sufficiency of the evidence claim is governed by <u>Jackson v. Virginia</u>, 443 U.S. 307, 318 (1979). "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise

46

been satisfied-the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324; accord McDaniel v. Brown, --- U.S. ----, ----, 130 S.Ct. 665, 666, 175 L.Ed.2d 582 (2010)(per curiam).  When assessing a sufficiency of the evidence claim in a § 2254 petition, the sufficiency of the evidence standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n. 16.  Jackson "requires a reviewing court to review the evidence in the light most favorable to the prosecution. Expressed more fully, this means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" McDaniel, 130 S.Ct. at 673 (quoting Jackson, 443 U.S. at 326); see also House v. Bell, 547 U.S. 518, 538 (2006)("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict").  The Court emphasized that "the standard ... does not permit a court to make its own subjective determination of guilt or innocence." Jackson at 320, n. 13. Moreover, "a reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." McDaniel, 130 S.Ct. at 672 (citation and

internal quotation marks omitted).  Further, "under <u>Jackson</u>, the assessment of credibility of witnesses is generally beyond the scope of review." <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995).  The question is "whether, viewing the evidence in the light most favorable to the state, it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could have found, beyond a reasonable doubt that [petitioner] was guilty[.]" <u>Kamienski v. Hendricks</u>, 2009 WL 1477235 (3d Cir. May 28, 2009).

In this case, the insufficiency of the evidence as to burglary was raised on direct appeal.  <u>See State v. Zhu</u>, Docket No. A-4025-95T4 slip op. at 4.  The Appellate Division rejected the claim without discussion, merely commenting, "We are also satisfied that the convictions were based upon overwhelming evidence of defendants' guilt." <u>Id</u>. at 6.  This Court notes that, based on the testimony of Tu and Tam, as discussed in Part C, <u>supra</u>, and other overwhelming circumstantial evidence against Zhu, there was more than sufficient evidence to support Petitioner's conviction.  Accordingly, this Court finds that the New Jersey courts' rejection of Zhu's sufficiency of the evidence claim with respect to burglary was not contrary to, or an unreasonable application of <u>Jackson</u> and its progeny. Petitioner is not entitled to habeas relief on Ground Four.

E.   <u>Due Process—Prosecutorial Misconduct (Ground Five)</u>

In Ground Five, Petitioner argues that the prosecutor's use of perjured testimony and suppression of a police report violated his rights to a fair trial and due process in violation of the Sixth and Fourteenth Amendments.

First, with regard to the suppression of exculpatory police report evidence, Petitioner alleges that the prosecutor failed to provide the agreements entered between the authorities and four of the State's witnesses, namely, Alan Tam, Henry Tu, Cheng Liang Lin, and Ming Cheng a/k/a Ah Mee Liu.  Petitioner claims that withholding of these agreements deprived him of material impeachment evidence, thus violating his right to a fair trial and due process.  He also contends that the prosecutor did not provide defense with Ming Cheng's statement made to Sgt. Trahey of the Teaneck Police Department.  It appears from Petitioner's argument that Ming Cheng's statement gave police an account that the victims were heavily armed with various handguns and may have actually initiated the violence.

Petitioner next argues that the prosecutor's use of perjured testimony violated his rights to a fair trial and due process and constituted prosecutorial misconduct.  In particular, as to this claim, Petitioner alleges that the prosecutor knew that the trial testimony of gang member Ming Cheng that the victims were unarmed was false because Detective Danyo's application for a search warrant stated that Ming Cheng had told Sgt. Trahey that three of the gang members (<u>i.e.</u>, victim gang members) he picked up in New

York and transported to the house in Teaneck brought guns. Petitioner argues that Ming Cheng's statement to Sgt. Trahey [as recounted in Detective Danyo's application for a search warrant] "defeats the prosecutor's case-in-chief and would have completely changed the way the jury would have contemplated the culpability of the defendant.  The jury never heard evidence that the victims were heavily armed with various handguns and actually initiated the violence."  (Petitioner's Brief at pg. 86).

It also would appear that Petitioner is alleging that the prosecutor presented false testimony from State witnesses Tu and Tam when these witnesses testified that the federal government had not promised any sentence reduction in exchange for their testimony against defendants.  However, both Tam and Tu ultimately received substantially reduced sentences because of the substantial assistance that they gave to the government in testifying at Petitioner's trial.  At the time they pled guilty, Tam and Tu were facing a life sentence in prison.  However, Tam served four years in prison, and Tu served a six year custodial term.

This issue was raised on direct appeal by other defendants. In its opinion, the Appellate Division found that the state presented

> testimony from four Fuk Ching gang members, one of whom was
> a victim and another who was present at the scene.  The
> testimony of these witnesses was, to an extent, effectively
> impeached by defense counsel.  But the State's case also
> included other inculpatory evidence obtained from the crime
> scene, the vehicles used and a Brooklyn apartment where the
> crimes were planned.  The evidence included impartial

witness accounts and physical evidence directly connecting
defendants to the crimes.

State v. Zhu, Docket No. A-4025-95T4 slip op. at 7.

Petitioner, however, raised this issue in his state PCR

petition (after Tu and Tam had been sentenced in federal court).

The PCR court rejected the claim as follows:

> One issue raised by a number of-presumably by all but not
> argued by all, concerning Mr. Tam and Mr. Tu, who testified
> with regard thereto, and this issue was really raised at the
> Appellate Division [on direct appeal] on page seven.  The
> State's evidence included testimony from four Fuk Ching gang
> members and one of whom was a victim, another who was
> present at the scene.  The testimony of these witnesses of
> which I include Tam and Tu, although not mentioned [by
> name], was to the extent effectively impeached by
> defendants' counsel.
>
> So, I mean, certainly this issue was raised by the Appellate
> Division, discussed as to the impact of Mr. Tam an[d] Mr.
> Tu, and I think at the time Mr. Tam, Mr. Tu had not resolved
> all of their cases, were testifying in other proceedings in
> other courts not in New Jersey, not related—may be related
> to this but not part of this matter.
>
> So, certainly with regard to that, the fact that someone
> faces twenty-five years to life, perhaps, and then they
> receive less, is well examined and explored by defense
> counsel, and as I recall, Mr. Tam and Mr. Tu were never
> treated with too much respect by defense counsel, and
> because they wanted to make sure it was shown that they were
> making a deal and that that's really why they were
> testifying.

(November 21, 2005 PCRT 82:23-83:22).

On appeal from the denial of the PCR petitions, the

Appellate Division described the testimony of witnesses Tam and

Tu as follows:

> Alan Tam, one of the main witnesses against defendants, was
> a member of the Fuk Ching.  He pled guilty in federal court
> to charges related to the killings and agreed to testify at
> this trial.  Alan Tam testified that in early April 1993, he
> spent several days at an apartment in Brooklyn where Simon
> Lau, Chao Lin Feng, and Jeffrey Zhu attempted to recruit him

to participate in the murder of Ah Wong.  The motivation
behind this plot was to gain control of the alien smuggling
business and to strike back for the attempted killing of Xin
Dan Lin.  Alan Tam met with Ah Wong four days before the
killing.  He did not warn Ah Wong of the murder plot against
him.

Tu Wei Chung was also a member of the Fuk Ching gang.  Like
Tam, he testified for the State pursuant to a plea agreement
on federal charges.  He corroborated Tam's testimony.

State v. Lin, 2010 WL 1330272 at *2.

In Napue v. People of State of Ill., 360 U.S. 264 (1959),
the Supreme Court held that due process is violated when "false
testimony used by the State in securing the conviction ... may
have had an effect on the outcome of the trial." Id. at 272.
"The jury's estimate of the truthfulness and reliability of a
given witness may well be determinative of guilt or innocence,
and it is upon such subtle factors as the possible interest of
the witness in testifying falsely that a defendant's life or
liberty may depend." United States v. Bagley, 473 U.S. 667, 676
(1985)(quoting Napue, 360 U.S. at 269)).  However, "[a] finding
of materiality of the evidence is required....  A new trial is
required if the false testimony could ... in any reasonable
likelihood have affected the judgment of the jury ..." Giglio v.
United States, 405 U.S. 150, 154 (1972)(citations and internal
quotation marks omitted).  Thus, in United States v. Bagley, 473
U.S. 667, 677 (1985), the Supreme Court "noted the well-
established rule that a conviction obtained by the knowing use of
perjured testimony is fundamentally unfair, and must be set aside
if there is any reasonable likelihood that the false testimony
could have affected the judgment of the jury." Id. at 677

52

(citations and internal quotation marks omitted); accord Smith v. Phillips, 455 U.S. 209, 219 n. 10 (1982)("Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, we have required a new trial only when the tainted evidence was material to the case").

Here, there was no due process violation based on the use of perjured testimony or any unreasonable application of Supreme Court holdings. First, there was significant circumstantial evidence and other witness testimony linking Petitioner to the crimes, (for instance, Petitioner was observed running down the streets with the group that had chased down and killed Ah Wong, and he was observed picking up members from this group after they had fatally wounded Ah Wong, and speeding off in a blue van, which Petitioner was in when it was stopped by police within 20 minutes). Thus, the allegedly false testimony of Ming Cheng concerning the victims not having weapons, was not material to Petitioner's guilt or the fairness of his trial.

Second, Petitioner has not shown that witnesses Tu and Tam testified falsely when they testified that there was no promise of leniency made to them in exchange for their testimony. Moreover, given that defense counsel impeached Tam and Tu, in part, because they had each made deals, the allegedly false testimony of Tam and Tu that they received no promise of leniency, was not material to Petitioner's guilt or the fairness of his trial. Accordingly, Petitioner is not entitled to habeas relief on his use of perjured testimony claims. See Prosdocimo

v. Secretary, Pa. Dept. of Correc., 2012 WL 120102 (3d Cir.
Jan.17, 2012); Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir.
2004).

Petitioner also contends that the prosecution improperly
suppressed impeaching evidence from defense violated his rights
under Brady v. Maryland, 373 U.S. 83 (1963 ).  In particular,
Petitioner argues that Ming Cheng's statement to Sgt. Trahey in
which he stated that the victims were heavily armed was
suppressed, and that the agreements made between the authorities
and witnesses Tu and Tam were suppressed.  Related claims of
prosecutorial misconduct concerning alleged discovery violations
were raised by many of the co-defendants on direct appeal.  The
Appellate Division rejected the claims without discussion.  See
State v. Zhu, Docket No. A-4025-95T4 slip op. at 4 & 6 ("We are
satisfied that defendants received as fair a trial as they could,
under the circumstances.  We are also satisfied that the
convictions were based upon overwhelming evidence of defendants'
guilt.  While, therefore, there may have been some trial errors,
none of them are such as to require reversal.  We have carefully
examined all of the numerous contentions raised by counsel and
pro se defendants in light of the entire record and applicable
law and are convinced all but three issues require no further
opinion.").

The Supreme Court has held that the prosecution in a
criminal proceeding has a due process obligation to disclose to
the defendant its knowledge of material evidence favorable to the

defendant, either because the evidence is exculpatory or because it can serve to impeach a key prosecution witness.  See <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995); <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Brady v. Maryland</u>, 373 U.S. 83 (1967).  Supreme Court precedent clarifies that "[t]here are three components of a true <u>Brady</u> violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  <u>United States v. Bagley</u>, 473 U.S. at 682; <u>see also</u> <u>California v. Trombetta</u>, 467 U.S. 479, 488-89 (1984)(state's failure to retain breath samples was not unconstitutional where the chances are extremely low that preserved samples would have been exculpatory).

In this case, this Court has examined the state court record, as well as Petitioner's arguments set forth in his § 2254 petition, and concludes that Petitioner has not demonstrated that there was a non-disclosure of Meng's statement to police. Rather, in his state court proceedings, Petitioner argued that his counsel was ineffective for not using this information to impeach Meng or to seek a passion-provocation charge to the jury.

Thus, there was no suppression of material or impeaching evidence in this regard.  Further, with respect to the plea agreements between the federal authorities and witnesses Tu and Tam, it appears from the record that defense counsel had received federal documents relating to these agreements, such as federal "5K letters" and plea transcripts.  Moreover, as discussed above, defense counsel effectively impeached these witnesses regarding the lenient plea arrangements.  Thus, Petitioner has not shown that the outcome of the proceeding would have been different had he had the benefit of the allegedly suppressed impeaching evidence.  And since the Appellate Division's rejection of the claim on the ground that the alleged nondisclosure did not undermine confidence in the outcome of the proceeding, the Appellate Division's adjudication of the claim was not contrary to, or an unreasonable application of Supreme Court holdings.

F.  <u>Jury Charge on Accomplice Liability</u>

In Ground Seven, Petitioner argues that the trial court's accomplice liability instruction failed to convey to the jury that in any or all of the offenses charged, the accomplice could be found guilty to a lesser degree than the principal, based on the accomplice's own mental state.  Thus, this allegedly erroneous accomplice charge undermined the prosecutor's burden to prove guilt beyond a reasonable doubt, and rendered Petitioner's trial fundamentally unfair in violation of his right to a fair trial and due process guaranteed under the Sixth and Fourteenth Amendments.

Petitioner and other co-defendants raised this claim on direct appeal.  The Appellate Division rejected the claim without discussion.  <u>See</u> <u>State v. Zhu</u>, Docket No. A-4025-95T4 slip op. at 4 & 6 ("We are satisfied that defendants received as fair a trial as they could, under the circumstances.  We are also satisfied that the convictions were based upon overwhelming evidence of defendants' guilt.  While, therefore, there may have been some trial errors, none of them are such as to require reversal.  We have carefully examined all of the numerous contentions raised by counsel and pro se defendants in light of the entire record and applicable law and are convinced all but three issues require no further opinion.").

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal

habeas petitioner challenges jury instructions given in a state
criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process."  It is
> well established that the instruction "may not be
> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record.  In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted); see also Smith v. Spisak, ___ U.S. ___, 130 S.Ct. 676,

684 (2010)(no right to habeas relief if Supreme Court has not

previously held jury instruction unconstitutional for same

reason); Waddington v. Sauausad, 555 U.S. 179 (2009).

The United States Court of Appeals for the Third Circuit has

observed that a habeas petitioner who challenges state jury

instructions must "point to a federal requirement that jury

instructions ... must include particular provisions," or

demonstrate that the jury "instructions deprived him of a defense

which federal law provided to him."  Johnson v. Rosemeyer, 117

F.3d 104, 110 (3d Cir. 1997).  This is because district courts do

not "sit as super state supreme courts for the purpose of

determining whether jury instructions were correct under state

law with respect to the elements of an offense and defenses to

it."  Id.  As the Third Circuit explained,

In considering whether this case involves a claim of error under the Constitution, laws, or treaties of the United States, it is critical to remember that the Supreme Court has made it clear that the states define the elements of state offenses.  Accordingly, while there may be constitutionally required minimum criteria which must be met for conduct to constitute a state criminal offense, in general there is no constitutional reason why a state offense must include particular elements.  See McMillan v. Pennsylvania, 477 U.S. 79, 84-86, 106 S.Ct. 2411, 2415-16, 91 L.Ed.2d 67 (1986).

It thus follows that for the error of state law in the justification instructions, assuming that there was an error, to be meaningful in this federal habeas corpus action, there would have to be a body of federal law justifying the use of deadly force which is applicable in a state criminal action charging an offense based on the defendant's use of that force.  Then the error in the jury instructions would be significant if the instructions did not satisfy that body of law.  Put in a different way, the jury instructions on justification, even if correct under state law, would need to have relieved the state of the necessity of proving an element of the offense as required by federal law or to have deprived the petitioner of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action. If we concluded that a petitioner could obtain habeas corpus relief without making such a showing, then district courts in habeas corpus cases would sit as super state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it.

Johnson, 117 F.3d at 110.

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which

he is charged"); <u>Sandstrom v. Montana</u>, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused); <u>Smith v. Horn</u>, 120 F.3d 400, 416 (1997), <u>cert</u>. <u>denied</u>, 522 U.S. 1109 (1998)(the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law.").

"[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." <u>Victor v. Nebraska</u>, 511 U.S. 1, 22 (1994). As the Supreme Court explained in <u>Victor</u>, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury. <u>Victor</u>, 511 U.S. at 6 (citations and internal quotation marks omitted). "[A] misdescription of the burden of proof ... vitiates *all* the jury's findings. <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993) (emphasis in original). Such an error is considered structural and thus is not subject to harmless error review. <u>See</u> <u>id</u>. at 280-82. <u>But</u> <u>see</u> <u>Neder v. United States</u>, 527 U.S. 1, 8-11 (1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

In this case, the Appellate Division found no error with respect to the jury charge on accomplice liability sufficient to warrant any discussion in its opinion.  This Court has carefully reviewed the jury instructions as a whole, as well as the instruction on accomplice liability, and finds no error of constitutional dimension in this case.  Further, any deficiencies in the jury instructions were simply harmless error and were not capable of producing an unjust result.  See Williams v. Beard, 637 F.3d 195, 223 (3d Cir. 2011)("[E]ven if the trial court's accomplice liability charge was in some respect ambiguous, there is no reasonable likelihood that the jury applied the instruction in a manner that relieved the Commonwealth of its burden of proof with respect to first degree murder.").  Indeed, given the overwhelming circumstantial evidence presented at trial in this case, as set forth above in Sections A through E of this Opinion, and in the State's response to this petition (Docket entry no. 11 at pp. 45-47), the trial court's charge to the jury on accomplice liability was proper and did not prejudice Petitioner in any way.

Further, while Petitioner's counsel argued that there was no physical evidence linking Petitioner to the felony crimes and murders, and Petitioner's mere presence in the van did not establish his complicity in the conspiracy, it is clear from the record that the jury charge on accomplice liability contained express language that mere presence is not conclusive evidence of one's participation in the crime.  Moreover, as the State argues, the evidence presented at trial suggested only two possible

61

scenarios: the State's theory that Petitioner purposely involved himself in the homicidal conduct committed by others in the conspiracy, or the defense's theory that Petitioner had no criminal intent and did not participate in the killing at all, i.e., a claim of non-complicity. Thus, if the jury rejected Petitioner's claim of non-complicity, which they did, there would be no basis for an accomplice liability charge for the lesser-included of offense of aggravated manslaughter because there was no evidence presented for the jury to conclude that Petitioner possessed a mental state for the lesser crimes than that of the other co-defendants. Consequently, in this regard, any alleged deficiency in the accomplice liability charge plainly did not have the capacity to have a substantial and injurious effect on the verdict or produce an unjust result. Brecht v. Abrahamson, 507 U.S. at 637-38.

Finally, this Court concludes that the jury instruction was not plain error because the trial judge clearly instructed the jury about the State's burden of proof as to each offense and the elements for each offense and the elements for accomplice liability. In short, the jury instructions did nothing "to lift the burden of proof on an essential element of an offense." Therefore, having carefully reviewed the jury charges as a whole, this Court finds that Petitioner was not deprived of a fair trial by the overall jury instructions given, and any error as asserted by Petitioner in this regard was, at the very most, plainly harmless in light of the overall record. Moreover, the Appellate

Division's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on this claim.

G.  Ineffective Assistance of Counsel Claims

In Grounds Six and Eight of his petition, Petitioner argues that counsel was constitutionally ineffective.  In particular, in Ground Six, Petitioner argues that counsel "failed to exercise Petitioner's six remaining peremptory challenges to strike jurors Donna Rakowski, Elaine O'Brian and Alma Reavis which resulted in biased jurors on Petitioner's jury." (Petitioner's Brief at pp. 86-93, Docket entry no. 1-1).  In Ground Eight, Petitioner argues that counsel (a) failed to introduce the exculpatory statement in Detective Danyo's affidavit for a search warrant regarding possession of guns by the victims, (b) failed to object to prosecutor's erroneous statements regarding accomplice liability resulting in an erroneous instruction to the jury, (c) counsel would not allow Petitioner to testify at trial despite Petitioner's repeated requests; (d) counsel failed to investigate, interview and adequately impeach the testimony of witnesses, Henry Tu, Allan Tam, Cheng Liang Lin and Meng Cheng; (e) counsel withdrew his sustained objection allowing Tu to fabricate testimony that Petitioner confessed his complicity to kill Ah Wong; (f) counsel failed to present alibi defense; (g) counsel failed to investigate a blood stained piece of glass found in the underwear of one of the witnesses, Ming Cheng; and

(h) counsel failed to challenge illegal first search of the Brooklyn apartment that resulted in admission of illegally obtained evidence.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland.

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. See Strickland, 466 U.S. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," assessing the facts of the case at the time of counsel's conduct. See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001). To meet this first prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at

690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance.  Id.  In analyzing alleged deficient performance, a court "begin[s] with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy,'" Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1404 (Apr. 4, 2011)(quoting Strickland at 689).  A court "'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'"  Cullen, 131 S .Ct. at 1407 (quoting Strickland at 689-90).

If able to demonstrate deficient performance by counsel, then the petitioner must show prejudice, i.e., there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  As the Strickland Court explained, "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial."  Id. at 693.  Thus, the Court held that prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any

errors in light of the totality of the evidence.  <u>See id</u>. at 695-96.

As the Supreme Court explained,

In making this determination, a court hearing an
ineffectiveness claim must consider the totality of the
evidence before the judge or jury.  Some of the factual
findings will have been unaffected by the errors, and
factual findings that were affected will have been affected
in different ways.  Some errors will have had a pervasive
effect on the inferences to be drawn from the evidence,
altering the entire evidentiary picture, and some will have
had an isolated, trivial effect.  Moreover, a verdict or
conclusion only weakly supported by the record is more
likely to have been affected by errors than one with
overwhelming record support.  Taking the unaffected findings
as a given, and taking due account of the effect of the
errors on the remaining findings, a court making the
prejudice inquiry must ask if the defendant has met the
burden of showing that the decision reached would reasonably
likely have been different absent the errors.

<u>Strickland</u>, 466 U.S. at 695-696.

"The benchmark for judging any claim of ineffectiveness must
be whether counsel's conduct *so undermined* the proper functioning
of the adversarial process that the trial cannot be relied on as
having produced a just result."  <u>Cullen</u>, 131 S.Ct. at 1403
(quoting <u>Strickland</u>, 466 U.S. at 686 (emphasis in <u>Cullen</u>).  Thus,
habeas review of a state court's adjudication of an ineffective
assistance claim is "doubly deferential."  <u>Knowles v. Mirzayance</u>,
556 U.S. 111, 123 (2009).  To obtain habeas relief, a state
petitioner "must demonstrate that it was necessarily unreasonable
for the [state c]ourt to conclude: (1) that [petitioner] had not
overcome the strong presumption of competence; and (2) that he
failed to undermine confidence in the [outcome]."  <u>Cullen</u>, 131
S.Ct. at 1403.  In other words, the petitioner must establish
both deficient performance and resulting prejudice in order to

state an ineffective assistance of counsel claim.  See Strickland at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.  However, the Supreme Court further instructed that a district court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

In the instant case, Petitioner presented his ineffective assistance of counsel claims in his petition for post-conviction relief.  The PCR court rejected the claims, primarily because defendants did not show prejudice, and the Appellate Division affirmed on this basis:

> At the outset, we note that the State had a strong case. There were two eyewitnesses to the massacre: Lin Ling Chan and Ming Cheng.  They were both familiar with all defendants.  Identity was not an issue.  In addition, Alan Tam and [Tu] Wai Chung, who had prior knowledge of the conspiracy, testified for the State.  Against this background, defense counsel had little proof of arguments to counter the evidence against defendants.  From our careful review of the record, we note that counsel vigorously participated in the trial, cross-examining witnesses and making arguments on behalf of their clients.  Moreover, there was ample evidence of defendants' guilt.
> * * *
> It is well-settled that when arguing that counsel failed to conduct a pre-trial investigation or interview witnesses a defendant must do more than make bald assertions of denial of the effective assistance of counsel.  When a defendant alleges that his or her attorney inadequately investigated the case, the defendant must assert facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification....
> Here, [defendant] has not presented an affidavit or certification to support his assertions ...

\* \* \*
In sum, following the <u>Strickland/Fritz</u> standard, our review
of the record does not disclose any deficiency by any of the
trial, appellate, or PCR counsels.  Further, there is
overwhelming evidence that defendants committed the crimes
of which they were convicted.  Moreover, even if we assumed
that, in some respects, defense counsel's representation of
any of the defendants was deficient, defendants failed to
establish the defendants would have been found not guilty of
the charges [i]f their attorneys had handled the matter
differently.

<u>State v. Lin</u>, 2010 WL 1330272 \*4, \*5, \*10 (N.J.Super.Ct.App.Div.,

Apr.6, 2010)(citations and internal quotation marks omitted).

Given the overwhelming evidence of guilt, this Court finds

that the New Jersey courts' rejection of Petitioner's ineffective

assistance claims for failure to show prejudice was not contrary

to, or an unreasonable application of <u>Strickland</u> and its progeny.

Nevertheless, as to the individual claims asserted here,

this Court also readily finds no deficient performance sufficient

to merit to Petitioner's contentions.  As set forth above in this

Opinion, this Court found no constitutional violation with

respect to Petitioner's jury claims.  Thus, his claim concerning

counsel's failure to use peremptory challenges likewise fails.

<u>See</u> <u>DeLozier v. Sirmons</u>, 531 F.3d 1306, 1323 (10th Cir.

2008)("Generally, an attorney's actions during voir dire are

considered to be matters of trial strategy, which cannot be the

basis of an ineffective assistance claim unless counsel's

decision is so ill chosen that it permeates the entire trial with

obvious unfairness"); <u>Gardner v. Ozmint</u>, 511 F.3d 420, 425-26

(4th Cir. 2007)(noting that "[o]n habeas review, federal courts

generally accord particular deference to the judgment of trial

counsel during voir dire, state court's determination that
counsel's failure to use a peremptory challenge on allegedly
biased juror was tactical did not warrant habeas relief)
(citation omitted).  Thus, Petitioner is not entitled to habeas
relief on his ineffective assistance of counsel claims respecting
the jury selection process and failure to exercise peremptory
challenges.  (See also this Opinion, supra, at Section IV.A).

As to the claims regarding counsel's failure to introduce
the statement made by witness Meng in his statement to Detective
Danyo, counsel's failure to investigate and adequately impeach
witnesses Tu, Tam, Cheng and Cheng Liang Lin, and counsel's
withdrawal of a sustained objection concerning Tu's testimony
about Petitioner's admitted complicity in the plot to kill Ah
Wong, the underlying issues were adjudicated on the merits
consistent with Supreme Court precedent and were found to be
wholly lacking in merit.  See this Court's Opinion at Section
IV.E above.  There was simply no demonstration of deficient
performance by counsel on these claims that would have had any
effect of undermining the verdict.  Indeed, this Court notes that
Petitioner has not shown by any competent evidence that his
counsel did not attempt to interview theses witnesses, and even
so, it is highly improbable that counsel for the witnesses would
have allowed such interviews given that any such interviews could
have impacted the alleged agreements made between the federal
authorities and the witnesses on federal charges that were still
pending at the time of trial proceedings.  Moreover, as discussed

previously, defense counsel had sufficient information about the plea deals to adequately impeach these witnesses at trial.

As to the use of Detective Danyo's affidavit, because Danyo related what Investigator Trahey had reported from another investigator's comments after speaking with Cheng Meng, such report or affidavit would have been impermissible hearsay. Moreover, Meng admitted during his testimony at trial that he made such statements to the police immediately after the crimes, but contended that his statements were false at that time due to fear, anger and poor translation.  (October 23, 1995 Trial Transcript 134:1-137:8; October 25, 1995 Trial Transcript 27:2-34:25; and October 26, 1995 Trial Transcript 92:11-94:1). Accordingly, this Court finds no deficient performance by counsel and no resulting prejudice with respect to these claims.

Petitioner next argues that his counsel was deficient in failing to object to the prosecutor's allegedly erroneous statements concerning accomplice liability that resulted in an allegedly erroneous jury charge.  The underlying claim was found to be without merit as discussed above in Section IV.F. Accordingly, where there is no constitutional violation regarding the accomplice liability jury instruction, this Court finds no merit to Petitioner's claim of ineffective assistance of counsel on this particular claim.

Petitioner's argument that his counsel was deficient in failing to present an alibi defense or allowing Petitioner to testify goes to trial strategy.  Where there was eyewitness

testimony that Petitioner was present, and indeed, Petitioner admits only mere presence, and he was found in the getaway van shortly after the crimes, any purported alibi defense would have undermined a more viable defense that Petitioner had maintained through trial, namely, that he was not involved in the killings and did not possess the same intent as the other defendants. Petitioner also argues that he would have testified that he was in Boston, Massachusetts during the times Tu and Tam had stated that Petitioner was present with them before the actual crimes. But it is clear that the issue of Petitioner's testimony was discussed beforehand and tactically rejected because none of the co-defendants were willing to testify.

Finally, Petitioner's claims regarding counsel's failure to investigate a blood stained piece of glass found in witness Liu's underwear and failure to challenge the first search of the Brooklyn apartment (which search was conducted with the landlord's consent), lack merit. Identity of the blood stain as that of one of the victims would have had little impact in impeaching Liu since there is no dispute that the blood stained piece of glass was found on him. Moreover, counsel's failure to advance a motion to suppress that had little chance of success where consent for the search was obtained does not rise to the level of deficient performance. In fact, the landlord of the apartment testified that the lease of the Brooklyn apartment had terminated and furniture had been moved out of the apartment well before the police came to search the apartment. The landlord

further testified that he willingly and knowingly gave his consent to police to search the apartment. (July 19, 1995 Motion Transcript at 17:15-22:24). Petitioner's counsel also thoroughly questioned the landlord and more particularly, Investigator Goldrick and Detective Engle at the motion hearing. There was nothing from the testimony of the landlord or the police detectives who conducted the search that would indicate an illegal search sufficient to advance a meritorious motion to suppress. Accordingly, there is absolutely no merit to this claim by Petitioner.

Therefore, this Court concludes that the determination of the state PCR court and appellate court in finding no constitutionally ineffectiveness of counsel, resulted in a decision that was neither contrary to, nor involved an unreasonable application of clearly established federal law under Strickland, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Williams v. Taylor, supra. Petitioner has failed to demonstrate that the state court opinions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. Matteo, 171 F.3d at 891. Therefore, the Court will deny federal habeas relief on the ineffective assistance of counsel claims because they are substantively meritless.

H.  Cumulative Error

Finally, Petitioner argues that the cumulative effect of all of the alleged errors deprived him of a fair trial. The test for a "cumulative error" claim is whether the overall deficiencies "so infected the trial with unfairness as to make the resulting conviction a denial of due process." See Hein v. Sullivan, 601 F.3d 897, 917 (9th Cir. 2010)(relying on Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); Thornburg v. Mullin, 422 F.3d 1113, 1137 (10th Cir. 2005)(relying on Donnelly); see also Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008)("Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice'").

Petitioner raised his cumulative error claim in his state PCR proceedings. Because the PCR court found no merit to any of Petitioner's claims for post-conviction relief, there is likewise no basis or merit for habeas relief based upon an alleged accumulation of errors which did not exist.

Petitioner does not make any assertions that would suggest actual prejudice, and this Court, after carefully examining the state court record, cannot find any aspect of Petitioner's criminal proceedings suggesting, singularly or cumulatively, anything more than a hypothetical possibility of prejudice. Correspondingly, this claim does not merit habeas relief, since the state court's dismissal of Petitioner's cumulative error

argument was not an unreasonable application of Supreme Court precedent.

## V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.   An appropriate Order follows.

DENNIS M. CAVANAUGH
United States District Judge

DATED: 8/1/12

74